This is the fourth and last day of this panel sitting. I have the privilege of sitting with my colleagues Senior Judge Gene Davis and Judge Andrew Oldham. Council, those of you who will be arguing today, we have three cases on the docket. Those of you who will be arguing, please note that we are familiar with the arguments and the authorities set forth in your briefing. We've read your briefs, and if you could tailor your remarks accordingly, that would be appreciated. Secondly, those of you who have argued here before are familiar with our lighting system, which relates to the timing of your argument. When you get up to speak, the green light will go on, and when there are two minutes left on your principal argument, the yellow light will go on, which is a warning that you need to begin to wrap up. When the red light goes on, we ask that you complete your sentence and be seated, unless there's a question from the panel that you're in the middle of answering. So we'll go ahead and proceed with the first case here today on the docket. I'm not going to name everybody here in the title, Plaquemines Parish v. BP America Production Company, and this is No. 23-30294. Mr. Clement, if you'd like to begin. Good morning, Your Honors, and may it please the Court. Paul Clement for the appellants. This case involves the element that was missing in previous removal efforts, a direct contract with the Federal Government. That contract plainly satisfies the acting under element of Federal officer removal, and there is plainly at least an association or connection between refining avgas under contract with the Federal Government and producing the necessary crude from a vertically integrated company's own fields. Indeed, the contracts themselves draw the direct connection between crude production and refining by obligating the buyer of refined avgas, which is to say the Federal Government, to pay any new taxes assessed on crude. Plaintiffs and the district courts have resisted this conclusion by demanding that the Federal contract itself include Federal directives concerning the conduct that the plaintiffs challenge. But that demand is doubly problematic. First, it wrongly conflates the distinct acting under and related to prongs of the inquiry, and second, it reimposes the kind of demanding causal nexus requirement that both Congress and this Court have rejected. Well, it is what our in-bank court laid down, though, in Blatchley, wasn't it? Absolutely, Your Honor. The en-bank court, I don't think, could have been clearer that the related to test is a broad test. They define the test by reference to the TWA against Morales case, which is a Supreme Court case that emphasized the breadth of the terms related to. And I don't think it's irrelevant that the Morales case the Supreme Court's holding was that advertising from an airline was related to rates, routes, and services. But the court in the last paragraph, which I take as a holding, said henceforth, and it laid out a test, and the last prong was, must be a person that has acted pursuant to a Federal officer's directions and the charge conduct is connected or associated with an act pursuant to a Federal officer's directions. Absolutely, Your Honor, but you can't collapse those two and conflate them and say that the Federal contract itself has to provide the direction. What you first ask is, was there action under a Federal contract? And then you separately ask, all right, is the conduct that the plaintiffs are assailing, is that connected to or associated with the conduct you took under Federal direction? And it's very important not to conflate the two because otherwise the case would have come out the other way in latch-a-lays, because— But it seems to me there's two separate things. One is it has to be acting under a Federal contract. Yep. But then a separate requirement is it has to be—let's see what the language of the test was—that, I had it here a minute ago, this is, it's a person that has acted pursuant to a Federal officer's directions and four separate section, separate requirement, the charged conduct is connected or associated with an act pursuant to the Federal officer's directions. Right. So here's, just let's apply that, right? The challenge conduct is principally about the extraction and production activities. Is that related to something that my clients did under Federal direction under a Federal contract? Well, of course, in latch-a-lay, there were explicit directions that Avondale was required to install asbestos. Now, I don't find anything like that related to production of crude in your refining contract. Fair enough, Judge Davis, but let's think about that, which is to say the contract there at least arguably did say use asbestos. Now, it didn't say, and don't give any safety detail about safety issues at all. It's a negligence claim in latch-a-lay about lack of safety warnings and lack of safety precautions, failure to warn, negligent failure to warn case. So if, as the district courts and my friends over here demand, you had to look in the contract and the contract itself had to provide a direction as to the challenge conduct. But if you install a product in a vessel and warnings are necessary to safely install it, that seems to me to be pretty directly related to the contract. Well, and I would say by the same logic, Your Honor, if you have a contract with the Federal Government to refine Avgas, and not just to refine Avgas, but to refine vastly more Avgas than anybody else has before, and you're given a loan, tens of millions of dollars in World War II dollars, hundreds of millions of dollars in today's dollars, to expand your facilities, then if you're that same vertically integrated company and you take, you extract extra crude from a field that is particularly suited to Avgas production and send it to your refinery, that is action that is connected to or associated with actions taken under a Federal contract. And again, I think it's telling here that the connection between crude oil production and refinement of Avgas is, you can see it in the face of the contract. The contract says that if the price of crude goes up, the government will pay more for the refined Avgas. If there are new taxes on crude production, the government itself, within a contract with the refiner, will pay the increased taxes for crude production. Well, I could see a better connection if you had to furnish all the crude that you refined. But if you run short of crude, you could buy it on the open market. Absolutely, Your Honor, but if you look at the facts of these cases, the records are not perfect because we're talking about things that happened 80 years ago. But take the Texas case, for example, the Texas Company case. The field of production in the Texas Company case was the Delta Duck Club field. Now, that production from that field, best as the records show, and this is at ROA 34, 430, and 31, best as we can tell, roughly half of the production from that field went to the Texas Company refinery under Port Arthur to fulfill that company's, the same company's, Avgas contract with the federal government. And again, if you take a step back here, the gravamen of the plaintiff's claims is that my clients took too much out of these fields in World War II, and they did it with too much haste. And if that's the gravamen of the complaint, and the contracts with the federal government told us to take more, refine more Avgas than had ever been refined before, and here's $10 million to expand your facility so you can refine more Avgas, then when that Avgas-ready crude, let's say, in the field, in order to fulfill that contract, that seems to me to be closely associated with, connected to, and those are the terms that I think are the relevant terms after Lachie au lait. And, you know, again, I think if you, the closest analog this Court and the Supreme Court has given us are these FAA preemption cases, and in those contexts, frequent flyer programs are connected to or associated with rates, routes, and services. Advertising is connected to rates, routes, or services. If you look at the Third Circuit case in Ray Commonwealth's motion, which is one of the cases that this Court en banc relied on in order to expand the test, what the Third Circuit there held is that state post-conviction relief proceedings were associated with or connected to federal habeas provisions. And I actually think that's, it's weird that it's that analogous, but it's quite analogous. The contract there with the federal public defender didn't say anything about state court proceedings at all. It talked about having the federal public defender be able to represent indigent people in federal 2255 habeas proceedings. But yet the Third Circuit said when the federal prosecutor, you know, the federal defender essentially on its own motion started intervening and defending the same, their clients in post-conviction relief proceedings in state court, in Commonwealth court, that was associated with or connected to the federal proceedings. So it's a mistake to look to the federal contract and say that federal contract itself has to tell you that you can't do vertical drilling or you can't use steel. What you do is you look at the contract. You look at the federally compelled activity under the contract, which I'll admit here is refining and not production directly. But then you ask, is the challenge conduct associated with or connected to what you did under the federal contract? How far would your test take us, though? Can you give us an example of any downstream action that wouldn't, wouldn't, let's say, let's say you, BP has a truck loaded with a drilling rig headed to the drilling site in one of your, one of your fields. And it rams into a line of cars. Is that, you're going to, you're going to say he could sue a federal officer? So, I, I, I doubt it, Your Honor. And I guess I would say two things in answering this question. One is, the Lachia Lake En Bonne Court itself recognized that by recognizing Congress's decision to broaden the related two-prong, that that was going to mean that that prong didn't weed out as many cases as it used to. That was the holding of, of this court. But then it pointed to the colorable federal defense provision in requirement and said, that's something that's going to continue to have a limiting and a narrowing effect. So, if you're talking about, you know, janitorial services or a negligent truck driver on a field, I don't know how I'm going to be able to make a colorable federal defense in that kind of case. And I think it'll get I mean, if you don't tie it to the contract, that you're just in never-never land in trying to predict the next case. I, I don't think so, Your Honor. And let me say two things about limiting principles, if you will. First of all, if you wanted some comfort about limiting principles, you could decide this case by pointing to the fact that this contract we're refining has multiple references to crude oil production. It's in the pricing provisions. It's in the who pays the taxes provisions. But to say that crude oil production is related to refinery, particularly in the context of World War II, is not at all a sort of fanciful outer limit kind of important limiting principle. But it doesn't seem as though the contract has the particularities that we traditionally look for, even after Latty-O-Lay. We know that just because there's a federal contract involved, that doesn't get you there. We also know that if you're regulated, such as tobacco cases or even the OSHA, the poultry Tyson cases after COVID, that doesn't get you there. But the, so what I would look for in the contract, tell me where I'm wrong, would be something that's a little more specific than we had a contract to produce crude oil and refine it. Is there anything that would indicate we want crude oil from these particular fields or this particular geographic area or this particular geologic formation, and we want it refined to be such and such octane so that it can be used in military vehicles? Is there anything of that sort that we can look at? So two things, Your Honor, you're not going to find all of that in these contracts. The contracts are relatively brief. You know, they're like 20 pages long, even with an addendum. Part of the reason for that, Your Honor, is that some of the other things that you're talking about in terms of which oil goes to what fields, what fields are the right thing for refinement is provided in regulations. Now, what I would submit to you is that regulations alone don't get the job done. But if you have a federal contract, you can then, in looking for the federal direction, look to the regulations as well. You're not limited to the four corners of the federal contract. And that almost has to be the case, right? I mean, if you imagine the facts of Lachiole, and the contract just said, repair the ship. And then there were regs that said, use asbestos. I don't think you would say, well, you know, regs don't get you there alone. And some of the direction we needed was from the use asbestos regulation, so you lose. I don't think you would have said that. The second thing I want to put in, you know, to get on the table is the idea that this search for specifications in the contract, I think, is an artifact of the fact that a lot of times, these federal contract cases, you're thinking about a boil-type design defect claim. And so you're looking for something in the contract that tells the contractor, here's exactly how you should build this thing. But the gravamen of this case is not, like, how to refine avgas. This is really a case about quantity and haste. This is a case where the gravamen of this is, with 80 years of hindsight, the plaintiffs are looking back at what happened in World War II. They are, in my humble view, ignoring the broader context of World War II, and what a complete effort this was to get avgas to our people in the field. And then they're saying, you took too much out, and you took it too quickly. You didn't take the kind of careful steps that in 2023 would be a matter of course. You'd drill differently. You wouldn't use earthen pits. And if I could, I only have a minute left, so I would like to take a step back and emphasize that this is exactly the kind of case that federal officer removal is built for. I mean, you have a claim by parishes that if this is not removed, are going to be tried in front of juries, drawn from that parish, and they are going to be pointing to conduct that my clients did, and it's conduct that we did at the behest of the federal government, and we unassailably did it to fulfill our federal government contracts. Those are exactly the kind of cases that you want in federal court. As this court said in Lachule, if you look at the Wilmingham case from the Supreme Court, at some level you're asking, you know, is this a case where you'd want the federal defenses to be in a federal forum? And I think if you ask that question about this case, in light of the fact that the federal government is the gravamen of why this expansion took off the way it did and was done with such haste, I think it's a perfect case for federal jurisdiction. Thank you, Your Honor. Thank you, Counsel. You have reserved time for rebuttal. We'll hear from Mr. Marcello now on behalf of the plaintiffs. Thank you, Your Honor. Your Honor, as I understand the theory of removal, defendant's theory is that a civil action can be removed even if no acts alleged against the defendants in the case were under federal direction. This is a very unique case. I cannot find a case where the acting under elements are not in the petition or complaint itself. The burden that they acted under a federal officer while engaging in crude oil production activities, that are the subject of the lawsuit. But Latchley did not say that the complaint does not have to allege even a single act subject to federal direction to satisfy the acting under element. No reported case that I can find can even say that it says that. I mean, if the oil company had a contract with the government to refine, why aren't they acting under the federal government? Now, the separate element of whether that's associated with the charge conduct may be there, but surely if they've got a contract, they're acting under the federal government. There's no question about that, Your Honor. They're acting under to produce refined products. That's what they're doing. They're not acting under to produce. The acting under section of the test is satisfied, is it not? It is, but this is a unique theory if you drill down into it. What it's ignoring is actually the text of the statute. The text of the statute says a civil action must be against or directed to a person acting under a federal officer. The lawsuit, in other words, the lawsuit, which is a civil action, must contain acts by a person acting under federal direction. If the federal government says double your production from 2,500 barrels a day of 100 octane avgas to 5,000 in your vertically integrated company, where does the crude come from? I'm sorry. I didn't understand it. If the government says we need you to double your production of refined avgas from 2,500 barrels to 5,000 barrels a day, where does the crude come from? If you're the supplier of the refined avgas, where are you going to get the double capacity? You're going to get the crude, and there are several sources you can get the crude. Where would they get it? Let's take the Texas company. Where are they going to get it? Let me point that out. The evidence shows, and this is what the evidence shows in the record, crude oil was purchased on the open market. So it's the theory that you could have produced it. You could have. You had no contractual prohibition on buying it on the open market. You didn't have to get it from these parishes. Is that the theory? That's the fact, that you didn't have to. So the supplier, or the repairer in Latte Alley, didn't have to install the asbestos the way they did. They didn't have to omit the safety warnings. There are any number of things they could have done. And with 80 years of hindsight and all the understanding of asbestosis and everything else that we know now, maybe they should have done it. If they were being judged by 2023 standards, they should have insulated it better, covered it better, put up warning signs better, put respirators on their workers. There's a hundred things they could have done, maybe more than a hundred things. So to hear that you absolutely could have, if you knew what was going to happen in 2023, you could have gotten the oil out differently. Or you could have bought it from a different field that had different kinds of, there's a bunch of things they could have done, but I don't understand. It's not a could have done, Your Honor. This is actually what happened. The record clearly shows it. Give me a chance to go through what the record shows. Crude oil was produced on the open market by refineries from crude producers and from each other. Producers commonly shipped crude oil to non-owned, non-affiliated refineries, which is what happened in Plaquemines II. Producers who shipped crude oil to their own refineries actually commingled it with other refineries. And actually the government controlled where the oil went after. It was not a question of supply. If you look at the supplemental evidence that was put in by Shell in the Cameron case, there's Shell magazines that say we are prepared to produce everything we need to produce during the war. And the idea that Mr. Clement comes up with that somehow this case is about extracting too much oil, that is nowhere, absolutely nowhere in the record. It does appear in Your Honor's, in the review of the facts, and actually it was stated by Judge Fellman in his factual recitation. It's based on one thing. This is what this whole removal has been about. It's been about making up facts. It's based on one statement that the 24-7 nature of oil production caused wave action that would damage the marsh. That's it. The government controlled allowables. Actually the government controlled production because it didn't want too much oil to be produced because to produce too much oil was going to destroy the reservoirs. That's what happens when you have an unregulated rule of capture and no conservation laws. And the states did that work. The government didn't do it. So there was actually the finding in this case, in this litigation, in Plaquemines 2, was that no one, no one in the federal government controlled crude production. And this court has said that you have to look to the relevant federal officer in determining the relationship between the direction and the charge conduct. There is no relevant federal officer that controlled crude production. There are relevant federal officers that regulated crude production, but none that controlled crude production. So I just want to make sure I understand your answer, in particular Judge Davis. So you agree that they were acting under the direction of a federal officer because they have contracts with the Defense Supply Corp. Yes. Okay, so that's not the question. They were acting under, in a refinery, they were acting under in refining. Totally understood. So they're acting under. So the only question in front of us is whether your claims and the gravamen of the complaint filed in state court relate to those contracts. No, it's not. Okay, help me. It's not target. It's not against or directed to anyone acting under. Understood. But I thought you just told me that we're not focused on acting under because they clearly are acting under, they have contracts. No, I admit they acted under, and it's what I said in my answer, they acted under in refining. They didn't act under in producing crude. And that, the charge conduct involves the fact that somehow, this is their argument. Their argument is that we have to produce a massive amount of refined product so we needed a massive amount of crude. What does that prove? That proves nothing. I understand. So maybe the better way to get at this is can you give me an example of how a defendant could be acting under the direction of a federal officer and that the claims would not relate to that acting under capacity? Like in your view, what do the two prongs do differently? Because each time I ask you about one, you start talking about both of them together. So I'm trying to understand how would you disentangle them? I mean, you agree with me that they're different, right? They're doing different things. Yes, they're separate. They're independent requirements. They're separate. But this Court has said that, it said in St. Charles that the fact that, and this is really all a play on St. Charles. The theory is, is that if you act under as a defendant, you act under a defendant for whatever you do. And St. Charles refuses to go along with that. Can you give me an example of how a defendant could act under, but that the claims would not relate to that acting under? This case is a perfect example. The claims here are that the federal government directed refining. There's not one word in the federal government's contract or in anything that a refiner did that has anything to do with refining. It's divided into refining, transportation, and crude. And it's two steps removed from refining, what we're talking about here. This case has nothing to do with refining. So when you say nothing to do with, that sounds like you're saying it doesn't relate to, which I'm happy to listen to that argument. But what I'm trying to do is make sure that we pin down how you can apply the two prongs differently. So if the point is, look, we agree they were acting under the direction of a federal officer, but our claims do not relate to what they were doing, namely refining, then great. Let's talk about relate to. Great. So at least we've made some progress. So now we understand that they're different. And your argument really is that these claims don't relate to, that I'm sorry, that they're acting, that these contracts and the things we're doing under the contracts do not relate to. Correct. And they don't relate to the federal officer's directions because there are no directions anywhere in the federal government that directed. So can we go back to where we started? If the federal government says, I am directing you to do, I'm giving you loans, I'm guaranteeing the contracts, I'm directing you to expand capacity. I want twice the production of ABGAS. I want more storage. If you don't do it, I can kick out your contracts with third parties or I can take over your supplies and I can do it myself. I can buy unrefined products. I can buy leaded products. If the prices of the crude go up, I'm going to pay you more. If the price taxes go up, I'm going to pay you more. I am, all I'm telling you as the ABGAS, get it to me now. How does that not relate to getting the crude out of the ground? It doesn't relate to it because you can go on the open market and buy it. All it says is that the idea is you have to be acting under, that your acts have to be in satisfaction of your obligations under the directions. None of the directions that we're talking about in these contracts have anything to do with crude production. What was the provision in the contract in Latula that had anything to do with warnings? It did not have anything to do, but the difference is that in Latula, the contractor, Huntington Ingalls, was required to use asbestos. Here, none of these companies were required to use their own oil. They could go on the open market to get it. There was more than enough after 1943 to get it. Let me just explain. This is the most dramatic reason why. I'm just going to use Shell as an example. It's in the Cameron case, and I don't know how they get around this. There's 13 of these refinery cases, excuse me, there's 13 cases out of the 42 against Shell. This refinery, in other words, Shell produced in 13 cases. I say 12 in the brief, but we recounted it's 13. In 9 of those cases, they don't have this refinery argument. In 4, they do. That means that despite the fact that Shell had 120 refinery contracts, they could not relate their production in over 9 of the fields, because some of the cases have more than one field, to the contract. But somehow, they can do it here simply because, what? Simply because by coincidence, they refined oil that they produced in this specific field. Well, these facts that I just told you shows that if in 9 of the cases, they never refined crude from a particular operational area, well, then that means, that shows that in each case, it was really not necessary for them to use oil from that operational area. I mean, what this does, this is the theory. Their theory, and they say it, and they say that all suits, all suits that are, and I want to get the correct language, all suits for or relating to an act under federal direction are removable. Well, if you're going to read it that broad, then how do you not say that, as Judge Fallon pointed out, how do you not say that janitorial service cases are removable, or construction of the refinery cases are removable? There's no end to it. Well, I mean, as Mr. Clement pointed out in his opening, you still always have to, Mesa versus California, right? You always have to have a colorable federal defense. So the statute can run right up to the limits of Article 3, but at the end of the day, the Supreme Court tells us that the Article 3 requirements is that they have to have a colorable federal defense. Otherwise, they can't avail themselves of a federal forum, and in the janitorial contract cases, or Judge Davis gave the example about the BP truck in the field, it's not clear what the federal defense would be. And I don't really take you to be challenging their colorable federal defense. Do you agree that preemption, the Boyle defense, that kind of stuff, they pointed to three colorable federal defenses, and I don't think you challenge those. They do, but more broadly speaking, is that the whole statute, as Justice Scalia has pointed out, is based upon federal officers who have a duty, a federal duty, have been delegated a federal duty, and this Court has already ruled that there was no duty, federal duty, that was being executed by any private person in producing crude oil. Let me ask the question this way. If we decided that Section 1442 extends to this case, and that Congress, you know, the text of the statute reaches this point, that it would be in federal court, do you think that would be unconstitutional? Do you think there's an independent Article III backstop behind that that would say, well, no, the colorable federal defense, I'm sorry, the federal defense is so weak that it would actually be unconstitutional to let it into federal court? Well, I'm on the spot here to think of a rather complicated argument, but yes, maybe so. Did you argue that? I mean, obviously, it's jurisdiction. I'm not arguing it. I'm not arguing it. Oh, okay. Okay. I'm not arguing it. I don't think I've put forth any constitutional arguments in my brief, but... All of the claims in all of the petitions relevant to this case, involved in this case, are state law claims. Is that correct? State law, and there's three pages, details, establishing in the petition that they're strictly under the state... All state. We're only concerned with only a federal defense. Yes. And the federal defenses are what Judge Oldham pointed out, but the entire statute is based upon a federal, a delegated federal officer, or a contracted federal officer being able to defend himself for what he did in the line of duty. None of this is in the line of duty. If you're producing crude, my simple question is, how could Shell, in nine cases, not have been discharging a federal duty, in nine of the cases, in discharging the duty in four of the other cases, simply because of happenstance that the oil came from a specific operational area involved in the case? That's not logical. In Plaquemines 2, this court found, and just to point out in connection with that, Judge Zaney makes a good point in his opinion, that really this issue came up in Plaquemines 2. And the defendants in Plaquemines 2, many of the same defendants here, tried to hitch their wagon, to hitch their acting under wagon, to the refinery contracts from non-owned or affiliated refiners. And the court said no. And what Judge Zaney points out, that the issue was not an issue of privity, which is what the issue is here. It's not an issue of privity. It was an issue that they weren't acting under those contracts, the refinery contracts. And so both, we have four judges in the district courts that have found no acting under and no relationship. And the only related to argument they have here is that gee, we needed more oil, so it took massive quantities of crude to make massive quantities of refined products. So it's all related. Well, where are you going to draw the line? Judge Higginson pointed out, where is the line? The line is pretty far. This is going to, and what I would suggest to your honors is that really the backstop for all of this ought to be the actual statute itself. How can you, once you flip it around, and once you say that the acting under, the acts under a federal direction, do not have to be the subject of the plaintiff's complaint, then the doors are open. And I pointed out to your honors in my brief, I got criticized for saying it four times in the brief, but all you've got to do is look at Watson. Watson says directly that the statute is intended, that the acting under must be apparent in the complaint itself. In carrying out the acts in the complaint, the person was acting under a federal officer. In carrying out the acts of the complaint, that is crude production, they weren't acting under federal officers because this court has unequivocally held such in Plaquemines 2. Lastly, the bottom line in acting under in the Watson case is subjection, guidance, and control. The bottom line in really all of this court's acting under jurisprudence is subjection, guidance, and control. This court has already held there was no subjection, guidance, and control of crude production. This court has also held that acting under and the related to elements are distinct, and this court in St. Charles 2 held that a federal officer who acts under, as in this case, acts under, excuse me, a private party who acts under a federal officer for one purpose does not actually or does not always act under for all purposes. And that really kind of sums it up. All right. Any questions? Thank you, counsel. All right. Mr. Clement, you've got 5 minutes of rebuttal time. Thank you, Your Honors. Just a few points of rebuttal. Let me just first start with the Watson case. I mean, my friend does love that one sentence of dictum, but the problem is that Watson is a 2007 case. The statute's amended in 2011. So Justice Breyer, writing for the court, may have well summarized the for requirement, but now we have for related to, and Lachiolas obviously makes clear that that's much broader. So that line of dictum, I think, is no longer good law. The second point I'd make is, you know, I'm pleasantly surprised that I think my friend eventually conceded that the acting under prong is satisfied. And that's more critical than it may seem, because all these decisions by the district courts here were done under the acting under prong, and they were done by sort of smuggling back in a connected to test under that, and really a nexus test that was more like what was abandoned in Lachiolas. So that brings us to the associated with, connected to, related to test from Lachiolas. Now I have a strong sense of what that test is, and we satisfy it, but here's what it's not. It's not a test where you say, all right, let me ask a hypothetical about whether there was a way to comply with the contract that didn't involve tortious conduct. That can't be the test, because you could have complied with the contract in Lachiolas by providing all the warnings in the world, and it would have violated the contract. So we know it's not about hypos. I mean, going all the way back to Maryland against Soper, the chauffeur in that case could have stayed in the car and not gone along with the prohibition agents on the raid. But that's not what happened. You don't ask hypos. You look what actually happened in fulfilling the contract. Would it be fair to say that, or is this too broad, or not broad enough, to say that the related to provision is like a but for in a tort case, but for the contract, defendant would not have been doing X, Y, committing tortious conduct. Is that a fair characterization of your argument? I think that is a fair characterization of the test. I think if you thought that was too broad, you could tether it more by saying, well, when the contract itself draws a connection, where the federal government itself draws a connection, then that satisfies it well. I'd be perfectly happy with a but for test. I think we win under a but for test. But if you had concerns that that still left you with a floodgates problem, I think Lachiolas provides the answer to that, which is the colorable federal defense prong. But if you want more, you could say, well, in this case at least I don't mean the importing simple tort concepts into this, although we could all use some simplification in drawing the line. But cause and fact, you know, would that be a better way to describe? I mean, I think but for probably captures it better, honestly. But because I do think we're talking about a broad test, and a purposefully broad test. Another one of the points that Lachiolas made is that if you look at the whole history of the federal officer removal provision, it is a history of broadening it. Really, at every time Congress revisits, it broadens it. So, you know, there may be an impulse to say let's not open up the floodgates too much, but Congress does want cases like this to be decided in federal court. Now, I said one thing it's not is hypos, and the other thing it's not is a test of necessity. But it is tied to the federal officer's directions. Yes. And but what it asks is not did the federal directions direct the tortious conduct. It says, all right, let's look at what the federal contract directs. Now look at what the petitioners are assailing. And then as to those two things, is there association with connection to? And if you're talking about refining activity, and in particular, massively expanding refining activity, and extracting too much oil, extracting it with too much haste, I think that is a very close connection. And it's buttressed by the terms of the contract. It is buttressed by the federal government's own contemporaneous observations of how this industry works. I know it's a lot to ask to look at a 300-page history. But, you know, that 300-page history that the federal government put together is telling. One of the things it says is oil starts in the ground. In that same part of the history, it goes on and says refineries can't do anything unless they have crude. So the connection here is actually incredibly tight. I think it's tighter than the Third Circuit case between state post-conviction review and federal habeas. I think it's at least as close as advertising and frequent fire programs to routes, rates, and services. So I think we satisfy this test. If you need more or you want to narrow the opinion, I mean, if you look at pages 36 and 37 of the working with us as to these particular fields, and they are saying, okay, you get a little more steel to do a little more drilling in this field, at the same time they understand that that crude is going to these refineries to fulfill these refining contracts. So I think we have it all. The last thing I would say well, I actually shouldn't say anything more because my time is up. So thank you for your attention. Thank you, counsel. Thank you all for the outstanding briefing in this case. We appreciate the arguments you've made here today. The case will deem submitted. The court will render its decision in due course.